UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
WIRELESS INK CORPORATION,

                              Plaintiff,                    10 Civ. 1841 (PKC)

          -against-

FACEBOOK, INC. and GOOGLE, INC.,

                              Defendants.
---------------------------------------------------------x

---------------------------------------------------------x
WIRELESS INK CORPORATION,

                              Plaintiff,                    11 Civ. 1751 (PKC)

          -against-                               MEMORANDUM AND ORDER

FACEBOOK, INC.; GOOGLE, INC.;
YOUTUBE, INC.; YOUTUBE, LLC;
and MYSPACE, INC.

                              Defendants.
---------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          Plaintiff Wireless Ink Corp. ("Wireless Ink") has asserted multiple claims against

defendants YouTube, Inc., YouTube, LLC, Google, Inc. (collectively, "Google")[1], and

Facebook, Inc. ("Facebook") for direct and indirect patent infringement under 35 U.S.C. § 271,

both literal and under the doctrine of equivalents.  Defendants move for summary judgment

pursuant to Rule 56, Fed. R. Civ. P., on the bases of noninfringement and invalidity of the

asserted patents.  For the reasons stated below, the Court grants the defendants' motions for

---

[1] YouTube, Inc. and YouTube, LLC are wholly-owned subsidiaries of Google, Inc.  Thus, this Opinion refers to these parties collectively as "Google."

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-29-13

summary judgment of non-infringement, and denies the defendants' motion for summary

judgment of invalidity as moot.

## BACKGROUND

The following facts are either undisputed or described in the light most favorable

to Wireless Ink as the non-movant. See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir.

2011).

I.     The Patents-in-Suit.

The patents-in-suit, United States Patent No. 7,599,983 (the "'983 patent") and

United States Patent No. 7,908,342 (the "'342 patent"), disclose methods and systems which

allow users without web programming skills to create mobile web sites with personally-authored

content for display on mobile devices.  Both patents describe two separate web sites: a "content

management web site" and a "mobile web site."  While the asserted claims all relate to

technology which allows users to create and manage mobile web sites using a content

management web site, the claims of the patents-in-suit differ in several respects, as discussed

below.

A.  The '983 Patent.

The '983 patent, entitled "Method, Apparatus and System for Management of

Information Content for Enhanced Accessibility Over Wireless Communication Networks," was

issued to Wireless Ink on October 6, 2009.  (Chase Decl., filed Feb. 20, 2013 ("Chase Decl."),

Ex. I (the "'983 patent").)  The inventors of the '983 patent did not invent mobile web sites or

the idea of accessing web site information content over mobile devices.  This is admitted in the

specification of the patent, and other prior-art systems are described in the "Background of the

Invention."  According to the patent, these prior-art systems "suffer from a number of significant

drawbacks, including a failure to provide suitable integration of messaging, collaboration, location-based services or other wireless networking functionality with the generation of shared information content." ('983 patent col. 1 ll. 45-49.) These systems also "require a significant amount of programming knowledge for their proper use, and are therefore not suitable for relatively unsophisticated users." ('983 patent col. 1 ll. 55-58.) The '983 patent "provides techniques for efficient generation and management of mobile sites that are advantageously integrated with wireless networking functionality of a wireless network in a network-based communication system." ('983 patent col. 1 ll. 66-67; col. 2 ll. 1-3.)

   There are two main aspects of the '983 invention. The first discloses a method whereby information content is managed in a wireless network-based communication system. ('983 patent col. 2 ll. 4-7.) This is accomplished by providing a "content management web site" whereby a user can enter information in accordance with a specified format. ('983 patent col. 2 ll. 4-11.) The format is comprised of multiple selectable "mobile information channels," each corresponding to an information category. ('983 patent col. 2 ll. 7-11.) The patent describes "mobile information channels" as channels that "allow unsophisticated users to easily and efficiently author message data or other types of information content to be made accessible via a collaborative workspace, a data mailbox, a collaborative community, or other type of mobile site or portion thereof generated or otherwise managed in the system." ('983 patent col. 7 ll. 51-56.) Examples of mobile information channels "suitable for use in the illustrative embodiment" set forth in the '983 patent include channels relating to contact information, "announcements, chat, events, guest book, diary/journal, bookmarks/links, discussion forum, survey/poll, . . . [or a] photo blog . . . ." ('983 patent col. 7 ll. 66-67; col. 8 ll. 1-10.) After the user selects certain mobile information channels, "[t]he entered information is processed to generate for the user a

mobile site comprising information content that is accessible via one or more mobile devices over a wireless network of the system." ('983 patent col. 2 ll. 7-14.)

The second aspect of the '983 invention discloses a method for integrating multiple actions of the wireless networking functionality with the information content of the mobile site. ('983 patent col. 2 ll. 25-30.) The actions which may be integrated with the information content of the mobile web site include a messaging action, a collaboration action, and a location-based service action. (Id.) A user can decide which information will be associated with the wireless networking functionality when modifying the mobile web site's content via the content management site. ('983 patent col. 2 ll. 30-34.)

Claim 1, the only independent asserted claim, reads as follows:

A method for managing information content in a network-based communication system, the method comprising the steps of:

[1] providing a content management web site identified by a first uniform resource locator and accessible to a user of the communication system, the content management web site permitting the user to author content to be added to at least one of a plurality of predetermined selectable mobile information channels and to select activation of particular ones of the plurality of predetermined selectable mobile information channels, the content management web site comprising a web page listing the predetermined selectable mobile information channels with respective indications of whether or not said channels have been activated by the user; and

[2] generating a mobile web site identified by a second uniform resource locator different than the first uniform resource locator so as to allow the mobile web site to be accessed by a plurality of users independently of the content management web site via one or more mobile devices over a wireless network of the communication system, the mobile web site comprising a web page having activatable links corresponding to respective ones of the predetermined selectable mobile information channels that have been activated by the user through the content management web site.

('983 patent col. 18 ll. 21-47.)

B.  The '342 Patent.

The '342 patent, entitled "Method, Apparatus and System for Management of Information Content for Enhanced Accessibility Over Wireless Communication Networks," was issued to Wireless Ink on March 15, 2011. (Chase Decl., Ex. K (the "'342 patent").) The patent application that issued as the '342 patent was a continuation of the application that issued as the '983 patent. Accordingly, the specification of the '342 patent is similar to that of the '983 patent. As in the '983 patent, the '342 patent discloses a content management web site and a mobile web site, where the content management web site creates the mobile web site and allows the user to manage content for the mobile web site. ('342 patent col. 2 ll. 4-15.) The method disclosed by the '342 patent additionally allows users of the content management web site "to designate at least one data source that is external to the content management web site," from which the generated mobile web site will automatically receive data. ('342 patent col. 2 ll. 7-9.) The patent explains that "[t]he external data source may comprise, for example, one or more of a rich site summary (RSS) feed, a source of extensible markup language (XML) documents, a database source, a file source, a syndication services source, a device-captured data source, and a web services source." ('342 patent col. 2 ll. 16-20.)

Claim 1, the only independent asserted claim, reads as follows:

A method for managing information content in a network-based communication system, the method comprising the steps of:

[1] providing a content management web site identified by a first uniform resource locator and accessible to a user of the communication system, the content management web site being configured to permit the user to designate at least one data source that is external to the content management web site; and

[2] generating a mobile web site identified by a second uniform resource locator different than the first uniform resource locator, the mobile web site being accessible independently of the content management

web site via one or more mobile devices, the mobile web site being configured to receive data automatically from the external data source designated by the user at the content management web site.

('342 patent col. 18 ll. 25-42.)

II.     Procedural History.

The motions for summary judgment presently before the Court were filed in two separate but related actions that were consolidated for pretrial proceedings. On March 9, 2010, Wireless Ink commenced an action against Facebook and Google claiming infringement of the '983 patent. (Docket # 1, 10 Civ. 1841(PKC).) In response to perceived pleading deficiencies outlined by the defendants in an April 26, 2010 letter to the Court, Wireless Ink elected to file an Amended Complaint on May 14, 2010. (Docket # 16, 17.) In July 2010, the defendants filed Answers to the Amended Complaint asserting counterclaims against Wireless Ink. (Docket # 22, 24.) On October 21, 2010, the Court held a claim construction hearing and orally issued rulings for the '983 patent. On November 19, 2010, the defendants moved for judgment on the pleadings. (Docket # 51.) In response to Wireless Ink's "cross-motion" to file an amended complaint, Wireless Ink was permitted to file a Second Amended Complaint (the "SAC"), and did so on December 3, 2010. (Docket # 53, 54.) The defendants filed Answers to the SAC asserting counterclaims relating to invalidity. (Docket # 57, 58.) Wireless Ink filed Answers to the counterclaims on January 7, 2011. (Docket # 60, 61.) The defendants then renewed their motion for judgment on the pleadings, (Docket # 62), and Wireless Ink cross-moved for judgment on the pleadings, (Docket # 67). In a Memorandum and Order filed May 26, 2011, (Docket # 79), the Court denied the defendants' motion and granted Wireless Ink's motion to dismiss the defendants' counterclaims seeking a declaration of invalidity.

Meanwhile, on March 15, 2011 – the day that the '342 patent issued – Wireless Ink commenced a separate action against Facebook, Google, and MySpace, Inc., claiming infringement of the '342 patent. (Docket # 1, 11 Civ. 1751(PKC).) On April 25, 2011, the defendants filed Answers to the Complaint, with MySpace, Inc. asserting counterclaims against Wireless Ink. (Docket # 11, 13, 17, 19.) Wireless Ink filed an Answer to the counterclaims on May 16, 2011. (Docket # 34.) In June 2011, Facebook and MySpace, Inc. amended their Answers and Facebook asserted a counterclaim for patent infringement against Wireless Ink. (Docket # 45, 46.) Wireless Ink filed Answers to the counterclaims on July 14, 2011. (Docket # 48, 49.) On November 9, 2011, the Court held a claim construction hearing and orally issued rulings for the '342 patent. The Court later dismissed with prejudice all claims brought by Wireless Ink against MySpace, Inc. and all counterclaims brought by MySpace, Inc. against Wireless Ink, pursuant to a stipulation of voluntary dismissal entered as an Order on April 11, 2012. (Docket # 85.) The Court also dismissed without prejudice the counterclaim for patent infringement brought by Facebook against Wireless Ink, pursuant to a stipulation of voluntary dismissal entered as an Order on February 21, 2013. (Docket # 129.)

The instant motions for summary judgment were filed by Facebook and Google on February 20, 2013. The defendants move separately for summary judgment of non-infringement of both of the patents-in-suit, (Docket # 113 (Google), 118 (Facebook), 10 Civ. 1841(PKC); Docket # 113 (Google), 123 (Facebook), 11 Civ. 1751(PKC)), and move jointly for summary judgment of invalidity of the '342 patent, (Docket # 118, 11 Civ. 1751(PKC)).

DISCUSSION

I.     Summary Judgment Standard.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute about a fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." Gallo v. Prudential Residential Services, Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). In response, the nonmovant bears only a "limited burden of production," Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 84 (2d Cir. 2004), and "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought," Gallo, 22 F.3d at 1223. Nevertheless, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, Inc., 477 U.S. at 248 (quoting First Nat'l Bank of Ariz. v. Cities Svcs. Co., 391 U.S. 253, 288 (1968)). Those specific facts must be supported by "citing to particular parts of materials in the record," Rule 56(c)(1)(A), Fed. R. Civ. P, and any affidavits relied upon "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Rule 56(c)(4), Fed. R. Civ. P. "If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, Inc., 477 U.S. at 249-50 (citations omitted).

Local Civil Rule 56.1 of this District requires a summary judgment movant to submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civil Rule 56.1(d).

II.     Patent Infringement.

Patent infringement analysis is a two-step process. First, the Court must determine the scope and meaning of the asserted claim as a matter of law. Freedman Seating Co. v. American Seating Co., 420 F.3d 1350, 1356-57 (Fed. Cir. 2005) (citation omitted); see Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996). Second, the finder of fact must compare the properly construed claim to the allegedly infringing product or process. Id.

Literal infringement of a patent requires that every limitation recited in the asserted claim appear in the accused device or method. DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1331 (Fed. Cir. 2001) (citations omitted). Therefore, if even one limitation is not present in the accused product, there is no literal infringement. See Laitram Corp. v. Rexnord,

Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991) ("[T]he failure to meet a single limitation is sufficient to negate infringement of the claim . . . .").

To prove infringement under the doctrine of equivalents, a patentee must show that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997). To defeat a motion for summary judgment on the doctrine of equivalents, the patentee must "provide particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine issue of material fact as to equivalents." AquaTex Industries, Inc. v. Techniche Solutions, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007) (citation omitted). This particularized testimony must come from "a person of ordinary skill in the art, typically a qualified expert." Id. at 1329. "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." Id. at 1328 (quoting Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567 (Fed. Cir. 1996)).

III.    Facebook Does Not Literally Infringe the '983 Patent.

Facebook contends that it does not literally infringe the '983 patent because it has no accused features which meet the limitations of Claim 1, the only independent claim asserted. Specifically, Facebook contends that Wireless Ink has failed to produce any evidence that Facebook has a "content management web site" as required by Claim 1. The Court agrees.

Claim 1 requires, inter alia, that the "content management web site compris[e] a web page listing the predetermined selectable mobile information channels with respective indications of whether or not said channels have been activated by the user." ('983 patent col. 18 ll. 32-36.) The Court construed this language to require that the content management web site

10

have indications specifying "whether or not the user has chosen such mobile information channels to be visible at the mobile web site." (October 21, 2010 Claim Constr. Hr'g Tr. at 50.) Facebook asserts that Wireless Ink has not identified any Facebook web page that allegedly meets this claim limitation. In support of this assertion, Facebook cites the deposition testimony of Wireless Ink's technical expert, Janine Warner. (Facebook 56.1 ¶¶ 28-30.) Ms. Warner was asked at least seven times during her deposition if she could identify a Facebook web page meeting this limitation, and she was unable to do so. (Weinstein Decl., filed Feb. 20, 2013, Ex. C at 330:24-337:21.) Ms. Warner additionally stated that she never looked for such a web page. (Id. at 339:11-341:10, 343:7-344:17.)

In response, Wireless Ink argues that it need not identify a single Facebook web page that meets this limitation. Wireless Ink, quoting Federal Circuit precedent, notes that the use of the indefinite article "a" in a patent claim generally carries the meaning of "one or more" and not "one." (Pl. 56.1 Resp. ¶¶ 28-30 (quoting TiVo, Inc. v. EchoStar Commc'ns Corp., 516 F.3d 1290, 1303 (Fed. Cir. 2008)); see also Pl. Opp. to Facebook's Mot. at 10 (same).) Thus, according to Wireless Ink, the requirement that the content management web site "compris[e] a web page . . ." does not mean that a single web page has to perform the listed functions. (Id. (emphasis added).)

Wireless Ink's argument fails for two independent reasons. First, assuming arguendo that Wireless Ink's construction of "a web page" as "one or more web pages" is proper, Claim 1 would require that the content management web site comprise one or more web pages with each web page "listing the predetermined selectable mobile information channels with respective indications of whether or not said channels have been activated by the user." Despite Wireless Ink's assertions to the contrary, the fact that "a web page" might properly be construed

as "one or more web pages" does not mean that the list of "predetermined selectable mobile information channels" can appear on a separate web page from the "respective indications of whether or not said channels have been activated by the user." The Court rejects such a construction of the claim language.

This conclusion is mandated by the plain language of the claim, the specification, and common sense. For the content management web site to comprise a web page listing the "selectable mobile information channels with respective indications of whether or not said channels have been activated by the user," the list of channels and the respective indications of whether those channels have been activated must logically appear together on the same web page. The indications would be indicative of nothing if they appeared on a web page wholly divorced from the list of mobile information channels to which they correspond. Indeed, the words "respective indications" would have no meaning if the indications did not clearly correspond with the mobile information channels. It is therefore not surprising that Wireless Ink makes no attempt to explain how a set of web pages could arguably meet this limitation under its proposed construction.

Moreover, requiring that the list of channels and their respective indications appear on the same page is consistent with the example shown in Figure 8 of the specification. Figure 8, reproduced below, shows a web page on the content management web site listing the predetermined selectable mobile information channels ("M-Channels") with respective indications of whether or not each M-Channel has been turned "ON" or "OFF" by the user. ('983 patent Fig. 8; id. at col. 4 ll. 61-63.) The "Icon Legend" of Figure 8 explains that if a given channel is "ON," it is visible to visitors of the mobile web site, and if the channel is "OFF," it is not visible to visitors of the mobile web site. ('983 patent Fig. 8.) The fact that the list of

channels and their respective indications appear on the same page is precisely what allows the

user to see which mobile information channels have been activated by the user.  Thus, the plain

meaning of the claim language and the specification both support the conclusion that the mobile

information channels and the respective indications of whether those channels have been

activated by the user must appear on the same web page.

| username's M-Channels (mobile content and communication channels) | | |
|---|---|---|
| ▷ About | manage about content | ■ ON |
| ▷ Announcements | manage announcement content | ☐ OFF |
| ▷ Core | manage core content | ☐ OFF |
| ▷ Agenda | manage agenda content | ☐ OFF |
| ▷ Notes | manage notes content | ■ ON |
| ▷ Zine | manage zine content | ☐ OFF |
| ▷ Rant&Rave | manage rant&rave content | ☐ OFF |
| ▷ Surveys | manage surveys content | ☐ OFF |
| ▷ Chat | manage chat content | ■ ON |
| ▷ Journal | manage journal content | ☐ OFF |
| ▷ Guestbook | manage guestbook content | ☐ OFF |
| ▷ Links | manage links content | ☐ OFF |
| ▷ M-Card | manage m-card content | ■ ON |

— 808

Icon Legend:
■ ON : M-Channel is visible to site visitors.
☐ OFF : M-Channel is not visible to site visitors.
Click on the icon in the same row as the M-Channel you wish to turn On or Off.

Even if this Court were to accept Wireless Ink's argument that the list of mobile

information channels and the respective indications may be split across different web pages,

summary judgment against Wireless Ink would still be warranted for a second reason.  Not only

is Wireless Ink unable to identify a single Facebook web page that allegedly meets the claim

limitation under the construction adopted by the Court, but Wireless Ink has not identified the set

of Facebook web pages that allegedly meets the limitation under Wireless Ink's proposed claim

construction.  Wireless Ink asserts in its opposition brief that

> [Wireless Ink] has identified the web pages that satisfy these
> limitations in interrogatory responses and expert reports, with

> specific citations to relevant testimony by Facebook witnesses.
> See, e.g., Motion, Exhibit D (Expert Report of Janine Warner at
> Exhibit D) ("Users are permitted to author content to be added to at
> least one of a plurality of predetermined selectable mobile
> information channels on the content management website at
> Facebook.com . . . See, e.g., Fetterman Dep. at 131:8-132:25 . . . .
> The mobile web site comprises a web page having activatable links
> corresponding to respective ones of the predetermined selectable
> mobile information channels that have been activated by the user
> through the content management web site. See, e.g., Fetterman
> Dep. at 133:13-135:2 (for Pages); 126:11-25; 127:16-129:25 (for
> Groups).")

(Pl. Opp. to Facebook's Mot. at 11 (emphasis in original).)  But none of the information from the

expert report that is quoted by Wireless Ink concerns the indications limitation.  The quoted

material does not identify any Facebook web page or set of web pages that allegedly meets the

limitation.  The cited deposition testimony of Facebook witness David Fetterman does not, as

Wireless Ink asserts, appear anywhere in Ms. Warner's expert report.  Regardless, the cited

testimony is unrelated to the indications limitation and in no way purports to identify any

Facebook web page or set of web pages that arguably meets the limitation.  Finally, the Court

has reviewed the entirety of Ms. Warner's expert report, and the only reference to the indications

limitation is the following statement: "[a]fter a user activates one of the [accused mobile

information channels], there are respective indications of whether or not said channels have been

activated by the user." (Warner Decl. Re: Facebook, filed March 12, 2013, Ex. E at 9.)  Ms.

Warner provides no support for this assertion, which merely mimics the claim language.  Ms.

Warner neither identifies the Facebook web page or set of web pages that allegedly meets the

claim limitation, nor otherwise explains how the limitation is met by Facebook.  This conclusory

assertion does not raise a genuine issue of material fact that precludes summary judgment. See,

e.g., Sitrick v. Dreamworks, LLC, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert

assertions cannot raise triable issues of material fact on summary judgment.") (citation omitted).

"Summary judgment must be granted against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial." Novartis Corp. v. Ben Venue Laboratories, Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). In response to Facebook's motion, Wireless Ink has failed to come forward with evidence that would permit a reasonable fact-finder to conclude that Facebook provides a web page or set of web pages listing the mobile information channels with respective indications of whether or not said channels have been activated by the user, as required by Claim 1. Facebook's motion for summary judgment with respect to literal infringement of the '983 patent is therefore granted. See Laitram Corp., 939 F.2d at 1535; Voter Verified, Inc. v. Premier Election Solutions, Inc., 698 F.3d 1374, 1383 (Fed. Cir. 2012) ("[B]ecause they do not infringe those independent claims, the Defendants also cannot infringe associated dependent claims . . . as a matter of law.").

IV.     Google Does Not Literally Infringe the '983 Patent.

Google contends that it does not literally infringe the '983 patent because it has no accused features which meet the limitations of Claim 1, the only independent claim asserted. Claim 1 requires, inter alia, that (1) "the content management web site permit[ ] the user to . . . select activation of particular ones of the plurality of predetermined selectable mobile information channels," and that (2) the "content management web site" comprise "a web page listing the predetermined selectable mobile information channels with respective indications of whether or not said channels have been activated by the user." ('983 patent col. 18 ll. 27-36.) The Court construed this language to require that the content management web site permit users to "choose which of two or more mobile information channels will be visible" at the mobile web

site, and that the content management web site have indications specifying "whether or not the user has chosen such mobile information channels to be visible at the mobile web site." (October 21, 2010 Claim Constr. Hr'g Tr. at 47-50.)  Google contends that Wireless Ink has failed to produce any evidence that the accused Google features meet these limitations. The Court agrees.

Wireless Ink accuses two Google features of infringing the '983 patent: Google Plus and Google Docs.  Wireless Ink alleges that Google provides a "content management web site" for each of these accused features, identified by the uniform resource locators (the "URL's") of, respectively, "www.plus.google.com" and "www.docs.google.com."  (Google 56.1 ¶¶ 17, 37; Pl. 56.1 Resp. ¶¶ 17, 37; Warner Decl. Re: Google, filed March 12, 2013, Ex. D at 8, 11.)  According to Wireless Ink, Google also provides a "mobile web site" for each of these features, identified by the URL's of "www.plus.google.com/app/ . . ." and "docs.google.com/m . . . ."  (Google 56.1 ¶¶ 24, 41; Pl. 56.1 Resp. ¶¶ 24, 41; Warner Decl. Re: Google, Ex. D at 9, 12.)

With respect to Google Plus, it is undisputed that users at the accused content management web site can create user-authored content in the form of Google Plus "pages" ("Pages").  (Google 56.1 ¶¶ 67-71; Pl. 56.1 Resp. ¶¶ 67-71.)  To create a Page, a user at the content management web site first selects the category of Google Plus Page ("Category") that the user wishes to create from the five Categories listed on the content management web site: "Local Business or Place;" "Product or Brand;" "Company, Institution or Organization;" "Arts, Entertainment or Sports;" and "Other."  (Google 56.1 ¶ 70; Pl. 56.1 Resp. ¶ 70.)  Similarly, with respect to Google Docs, it is undisputed that users at the accused content management web site can create user-authored content in the form of Google Doc files ("Files").  (Google. 56.1 ¶¶ 85, 87, 89; Pl. 56.1 Resp. ¶¶ 85, 87, 89.)  To create a File, a user at the content management web site

first selects the type of Google Doc File ("File Type") that the user wishes to create from the

seven Types listed on the content management web site: "Document," "Presentation,"

"Spreadsheet," "Form," "Drawing," "Table," and "Collection." (Google 56.1 ¶ 88; Pl. 56.1

Resp. ¶ 88.)

       In its Local Rule 56.1(a) statement, Google asserts that neither of the accused

content management web sites have "a web page listing the predetermined selectable mobile

information channels with respective indications" specifying "whether or not the user has chosen

such mobile information channels to be visible at the mobile web site," as required by Claim 1 as

construed by the Court. (Google 56.1 ¶¶ 76, 78-82, 94, 96-100; see '983 patent col. 18 ll. 32-36;

October 21, 2010 Claim Constr. Hr'g Tr. at 50.) Google asserts that neither of the accused

Google features meet this limitation because at neither of the accused content management web

sites does a user have the ability to choose which particular alleged mobile information channels

will be visible at the mobile web sites. (Google 56.1 ¶¶ 80-82, 98-100.) Consequently, Google

also asserts that neither of the content management web sites include the requisite indications of

whether or not a user has chosen any of the alleged mobile information channels to be visible at

the accused mobile web sites. (Google 56.1 ¶¶ 76, 78-79, 94, 96-97.) In support of these

asserted statements of fact, Google relies on extensive citations to the expert report of Google's

technical expert, Dr. Peter Alexander, as well as the deposition testimony of Wireless Ink's

technical expert, Janine Warner, all of which substantiate Google's assertions.

       Wireless Ink's only attempt to controvert these asserted statements consists of the

following paragraph:

> As shown in the screenshots, simply activating the mobile
> information channels (such as "Product or Brand" for Plus, and
> "Presentation" for Spreadsheet) necessarily makes such channels
> visible on the mobile websites (m.google.com and

docs.google.com/m/). See, e.g., Pitcock Decl., Ex. 3, Surie Dep. at
110:5-15; 111:11-21.

(Pl. 56.1 Resp. ¶¶ 76, 78-82, 94, 96-100 (emphasis in original).) As an initial matter, this

response is ambiguous: despite the fact that Wireless Ink repeats this response over a dozen

times in its Local Rule 56.1(b) counterstatement, Wireless Ink does not once provide or identify

the "screenshots" to which it expressly refers. (See id.) Next, the only cited evidentiary support

for this statement consists of twenty-two lines of deposition testimony of Ajay Surie, which

exclusively concerns Google Docs. (See Pitcock Decl., Ex. 3 at 110:5-15, 111:11-21; see also

Chase Decl., filed March 26, 2013 ("Second Chase Decl."), Ex. 2 at 10:22-24, 18:25-19:6.)

Wireless Ink provides no evidentiary support pertaining to Google Plus. Finally, the cited

testimony consists exclusively of the marking of a deposition exhibit, and Mr. Surie's testimony

that Google Docs "is a collection of applications," that "not everything is hosted at the same

URL," and that one can "begin the process of creating a spreadsheet at docs.google.com."

(Pitcock Decl., Ex. 3 at 110:5-15, 111:11-21.) None of this cited testimony supports or relates to

Wireless Ink's asserted statement that "simply activating the mobile information channels . . .

necessarily makes such channels visible on the mobile websites." (Pl. 56.1 Resp. ¶¶ 76, 78-82,

94, 96-100 (emphasis in original).) Because Wireless Ink has offered no evidence with respect

to Google Plus, and because the cited testimony concerning Google Docs does not support

Wireless Ink's response or controvert Google's factual assertions, the Court disregards Wireless

Ink's response and deems Google's asserted statements of fact admitted. See VW Credit, Inc. v.

Big Apple Volkswagen, LLC, No. 11 Civ. 1950(PAE), 2012 WL 5964393, at *3 (S.D.N.Y. Nov.

29, 2012) ("Where an assertion made in a statement on a motion for summary judgment contains

'no citations or where the cited materials do not support the factual assertions in the statements,

the Court is free to disregard the assertion.'" (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 73-74 (2d Cir. 2001))).

Having failed to adequately controvert Google's asserted factual statements, Wireless Ink attempts to establish the existence of a genuine issue of material fact for trial by asserting the following in its Local Rule 56.1(b) counterstatement:

> 109.  Users can select activation of particular ones of a plurality of predetermined selectable mobile information channels and there are indications of whether or not said channels have been activated by the user.  There is a listing provided to the user which indicates the activation of particular +Page Channels.  Users can select activation of particular ones of a plurality of predetermined selectable mobile information channels and there are indications of whether or not said channels have been activated by the user.  There is a listing provided to the user which indicates the activation of particular +Page Channels.[2]  Pitcock Decl., Ex. 3 (Surie Dep. at 103:7-110:2).

> 110.  Users can select activation of particular ones of a plurality of predetermined selectable mobile information channels and there are indications of whether or not said channels have been activated by the user on the content management website.  Pitcock Decl., Ex. 3 (Surie Dep. at 110:5-15, 111:11-21.).

(Pl. 56.1 Resp. ¶¶ 109-110.)  Here, again, the only support for the asserted statements is the testimony of Mr. Surie, which in no way supports Wireless Ink's assertions.  The cited testimony in statement 109 makes no reference to Google Plus Pages, activation of predetermined selectable mobile information channels, or listings of indications; rather, the testimony exclusively concerns (1) an infrastructural component called "OnePick," (2) a keyboard handling code for Google Spreadsheets, and (3) the marking of a deposition exhibit.  (See Pitcock Decl., Ex. 3 at 103:7-110:2.)  The cited testimony in statement 110 is equally irrelevant, as discussed

---

[2] The Court notes that the third and fourth sentences of statement 109 as asserted by Wireless Ink are duplicative of the first and second sentences.

above, and provides no support for the statement asserted by Wireless Ink. (Pitcock Decl., Ex. 3

at 110:5-15, 111:11-21.) The Court thus disregards these wholly unsupported assertions.

> Finally, Wireless Ink asserts in its opposition brief that
>
> Wireless Ink has provided a detailed infringement analysis in
> answers to Google's Interrogatories, which were included in the
> Expert Infringement Report of Janine Warner. See Warner Decl.,
> Ex. D, as attached Exhibit D. There, Wireless Ink demonstrates
> that there are both a listing of channels and indicators of channel
> activation, citing to the relevant depositions of Google witness
> [sic].

(Pl. Opp. to Google's Mot. at 12.)    The Court has reviewed Ms. Warner's Expert Infringement

Report, and in the twenty-five pages of infringement analysis contained therein, the Court cannot

locate a single citation to the deposition testimony of any Google witness, or any other witness

for that matter. (See Warner Decl., Ex. D at 8-33.) In fact, the only statements made by Ms.

Warner with respect to "a listing of channels and indicators of channel activation" are duplicative

of Wireless Ink's assertions in statements 109 and 110, provided above. With respect to Google

Plus, Ms. Warner states that "[u]sers can select activation of particular ones of a plurality of

predetermined selectable mobile information channels and there are indications of whether or not

said channels have been activated by the user. There is a listing provided to the user which

indicates the activation of particular +Page channels." (Id. at 9.) With respect to Google Docs,

Ms. Warner states that "[u]sers can select activation of particular ones of a plurality of

predetermined selectable mobile information channels and there are indications of whether or not

said channels have been activated by the user on the content management website." (Id. at 12.)

These unsupported statements, which merely mimic the claim language and provide no

explanation as to how the limitations are met, are conclusory, and do not raise a triable issue of

material fact precluding summary judgment. See Sitrick, 516 F.3d at 1001; see also Davis v.

Brouse McDowell, L.P.A., 596 F.3d 1355, 1364 (Fed. Cir. 2010) (explaining that "[a]n unsupported opinion . . . cannot and does not create a genuine issue of material fact").

Wholly apart from any deficiencies in its Local Rule 56.1 submissions, Wireless Ink, in the face of Google's summary judgment motion, has failed to come forward with evidence that would permit a reasonable fact-finder to find that Google Plus or Google Docs meets every limitation of Claim 1, the only independent claim asserted. Therefore, Google's motion for summary judgment with respect to literal infringement of the '983 patent is granted. See Laitram Corp., 939 F.2d at 1535.

V.   Facebook Does Not Literally Infringe the '342 Patent.

Facebook contends that it does not literally infringe the '342 patent because it has no accused features which meet the limitations of Claim 1, the only independent claim asserted. Claim 1 discloses in relevant part a method comprising two steps: (a) "providing a content management web site . . . the content management web site being configured to permit the user to designate at least one data source that is external to the content management web site," and (b) "generating a mobile web site . . . the mobile web site being configured to receive data automatically from the external data source designated by the user at the content management web site." ('342 patent col. 18 ll. 25-42.)

Wireless Ink contends that there are at least three different ways in which Facebook infringes Claim 1. According to Wireless Ink, Facebook provides a "content management web site" in the form of a Facebook website identified by the URL of "http://www.facebook.com." (Facebook 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.) Facebook also allegedly generates a "mobile web site" that includes the URL of "http://m.facebook.com." (Facebook 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.) Wireless Ink contends that when a user decides at the content

management web site to (1) upload a photo or video from the user's computer, (2) enter a link or URL for a third-party web site, or (3) designate an RSS blog feed[3] – all features which Facebook concedes it provides – then the user has "designate[d] at least one data source that is external to the content management web site" as is required by step (a) of Claim 1. (Facebook 56.1 ¶¶ 8, 12, 14, 15, 16, 21, 22; Pl. 56.1 Resp. ¶¶ 8, 12, 14, 15, 16, 21, 22.) Consequently, in order to show that the accused features meet step (b) of Claim 1, Wireless Ink must demonstrate that the Facebook mobile web site is configured to receive data automatically from at least one of these three types of external data sources once the user designates the external data source at the content management web site. Wireless Ink is unable to make such a demonstration.

There is no dispute as to the operation of the accused Facebook features. When a user decides at the alleged content management web site to upload a photo or video from the user's computer, the photo or video is uploaded to and stored at Facebook servers. (Facebook 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.) When a user at the content management web site enters a link or URL for a third-party web site, Facebook makes a portion of that content, such as a summary or thumbnail image from the third-party site, available for viewing on Facebook; this third-party content is also stored at Facebook servers. (Facebook 56.1 ¶¶ 15, 19; Pl. 56.1 Resp. ¶¶ 15, 19.) Likewise, when a user at the content management web site designates an RSS blog feed, Facebook makes that blog content available on Facebook, and this RSS blog feed information is stored at Facebook servers. (Facebook 56.1 ¶¶ 21, 25; Pl. 56.1 Resp. ¶¶ 21, 25.)

Next, when a mobile device user attempts to access Facebook via the http://m.facebook.com URL, Facebook responds to that request by generating the accused "mobile web site" for the user. (Facebook 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.) Critically, when this

---

[3] Facebook discontinued the feature that allowed users to designate RSS blog feeds in September 2011. (Warner Decl. Re: Facebook, Ex. E at 13 n.4.) This feature was available during at least a portion of the period of asserted infringement, and its discontinuance has no bearing on the pending motions.

mobile web site is viewed by the requesting user, the mobile web site receives any designated photo or video, third-party web site information, or RSS blog feed information from the Facebook servers where such content was stored after the completion of the designation process at the alleged content management web site. (Facebook 56.1 ¶¶ 12, 19, 25; Pl. 56.1 Resp. ¶¶ 12, 19, 25.) It is undisputed that the accused Facebook mobile web site does not receive previously uploaded photos or videos from the user computer from which such data was previously uploaded at the content management web site, and that the mobile web site does not receive third-party web site information or RSS blog feed information from the third-party web site or external RSS blog that was previously designated by the user at the content management web site. (Facebook 56.1 ¶¶ 14, 19, 25; Pl. 56.1 Resp. ¶¶ 14, 19, 25.)

During the claim construction hearing, the Court construed the final clause of step (b) to require that the generated mobile web site be "programmed to receive data without further action required by the user from the same sources specified by the user in the preceding step." (November 9, 2011 Claim Constr. Hr'g Tr. at 103.) Accordingly, Facebook does not literally infringe Claim 1 of the '342 patent because the accused Facebook mobile web site is not programmed to receive data from the same external data sources specified by the user in step (a). Rather, the Facebook mobile web site is programmed to receive data from the internal Facebook servers where such data is stored after an external data source is designated by the user at the content management web site.

Nevertheless, Wireless Ink argues that Facebook's motion for summary judgment should be denied. Relying on the Court's construction of "web site" – "a set of related web pages, including the . . . data appearing thereon which exists on the server or servers of the website operator," (Nov. 9, 2011 Claim Constr. Hr'g Tr. at 30) – Wireless Ink contends that data

becomes part of a web site, including a mobile web site, at the moment when data is uploaded to, and thus "exists on," the servers that serve that web site. Wireless Ink notes that the alleged content management web site and mobile web site are served by the same Facebook servers. Therefore, according to Wireless Ink, when a user designates an external data source at the content management web site, data is uploaded to the Facebook servers for use with both the content management web site and the mobile web site, at which point that data instantly becomes part of the mobile web site, thus satisfying step (b)'s requirement that the Facebook mobile web site be "configured to receive data automatically from the external data source designated by the user at the content management web site." (See Warner Decl. Re: Facebook, Ex. E at 20-22; Pl. Opp. to Facebook's Mot. at 7-8.)

As an initial matter, Wireless Ink's argument exclusively concerns claim interpretation and the meaning and scope of the claim language of step (b). Wireless Ink does not identify a single disputed factual issue regarding the operation of the accused Facebook features. Indeed, in Wireless Ink's Local Rule 56.1(b) counterstatement, Wireless Ink does not dispute the material facts upon which Facebook's motion is premised. (Facebook 56.1 ¶¶ 5-25; Pl. 56.1 Resp. ¶¶ 5-25.) "Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of Claim 1 is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed. Cir. 1996) (citation omitted); accord Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1320 (Fed. Cir. 2012) (quoting Athletic Alternatives).

The Court adheres to its previous claim construction and rejects Wireless Ink's interpretation of the claim and theory of infringement. At the claim construction hearing,

Wireless Ink advanced an infringement theory analogous to the one it advances here. Wireless Ink argued that under the method taught by Claim 1, data cannot become part of the mobile web site until that data is brought into the internal servers that generate the mobile web site. Accordingly, Wireless Ink argued, step (b) only requires that the mobile web site receive data that originated from an external data source, not that the mobile web site receive data presently located at an external data source. Wireless Ink thus argued that step (b) is met at the moment that data from an external data source is uploaded to the servers that serve the mobile web site, i.e., at the moment that the user designates the external data source at the content management web site. (See November 9, 2011 Claim Constr. Hr'g Tr. at 78-103.)

The Court rejected Wireless Ink's proposed interpretation as inconsistent with the plain meaning of the claim language. The Court explained that Wireless Ink's construction impermissibly ignored the claim language "receive data automatically":

> THE COURT: You have to read the full language of the phrase. "Being configured to receive data automatically from the external data source." If it meant what you meant, what you are saying it means, it would have said, Configured to receive data automatically from the external data source or access material that originated from an external data source that is now stored on the content management website.
>
> . . .
>
> THE COURT: You are reading out the words "receive data automatically."
>
> . . .
>
> THE COURT: The mobile website must be capable of receiving the data automatically from the external data source. It would just strike me that a person of ordinary skill in the art would not use that language if they meant that once upon a time [it] existed on an external data source maybe three years ago. They wouldn't be talking about receiving automatically.

> MR. PITCOCK: Once the data is received, it cannot be external anymore.
>
> THE COURT: Then the mobile website is not receiving data automatically from the external data source. It is just not doing that. What it is doing is getting data that originated from an external source from the content management website. You could plainly write that. That is pretty plain.

(November 9, 2011 Claim Constr. Hr'g Tr. at 79-80.) The Court reiterated this point throughout the hearing, noting later that under Wireless Ink's proposed construction, the mobile web site "is not receiving data automatically from the external data source. It's receiving data from the content management website that originated from an external source. That is what [the claim] would say if it meant that." (Id. at 83.)

Wireless Ink's present argument is an attempt to reargue this Court's construction of "web site." More fundamentally, its argument fails to account for the fact that the accused mobile web site solely receives data from internal Facebook servers, not external data sources as is required by the claim. Wireless Ink again contends that step (b) is met at the moment when data from the external data source is brought into the servers that serve the mobile web site. But Wireless Ink now supports this argument by asserting that when data is uploaded to the internal Facebook servers in step (a), that data instantly becomes a part of the mobile web site because a "web site," as defined by the Court, includes the "data . . . which exists on the server or servers of the website operator." (See Pl. Opp. to Facebook's Mot. at 6-7.) But Wireless Ink improperly contorts the Court's construction of "web site," ignoring the first six words, "a set of related web pages including the . . . data appearing thereon which exists on the server or servers of the website operator." (November 9, 2011 Claim Constr. Hr'g Tr. at 30 (emphasis added).) Under the Court's construction, the mobile web site only exists once the "set of related web pages" that comprise the mobile web site has come into existence. It is undisputed that the web pages that

comprise the accused Facebook mobile web site are generated only in response to receipt of a

user request, and that the web pages do not exist when they are not being viewed by a user.

(Facebook 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10; Warner Decl. Re: Facebook, Ex. E at 11-12 ("Because

the pages of a content management website are generated dynamically, each page is generated

only when a request is sent to the server.  A content management website may deliver thousands

of pages to browsers, but the pages are not static, they only exist while they are being viewed.

This dynamic process means that each page is generated . . . as it is requested and each time it is

requested it is generated anew . . . ." ).)  As discussed above, it is also undisputed that the

Facebook mobile web site, once generated in response to a user request, receives data

exclusively from internal Facebook servers where the data was stored after it was uploaded to the

content management web site in step (a).  Therefore, the data uploaded at the content

management web site in step (a) cannot, as Wireless Ink asserts, become part of the accused

Facebook mobile web site immediately upon upload, because the Facebook mobile web site does

not exist unless and until a user request is sent to the server.  Moreover, once it is requested and

generated, the Facebook mobile web site logically can receive data from the Facebook servers

only after that data has been uploaded to those servers, i.e., only after a user has designated the

external data source at the content management web site.

       In sum, the plain language of Claim 1 requires that the mobile web site receive

data from the same external data source designated by the user at the content management web

site.  It is undisputed that the accused Facebook mobile web site solely receives data from

internal Facebook servers, not from the original external data sources.  Therefore, Facebook does

not literally infringe Claim 1 of the patent. Because Claim 1 is the only independent claim

asserted, Facebook's summary judgment motion for non-infringement of the '342 patent is

granted with respect to literal infringement.  See Voter Verified, Inc., 698 F.3d at 1383

("[B]ecause they do not infringe those independent claims, the Defendants also cannot infringe

associated dependent claims . . . as a matter of law.").

> VI.   Google Does Not Literally Infringe the '342 Patent.

Google contends that it does not literally infringe the '342 patent for the same

reasons advanced by Facebook – the accused Google mobile web sites receive data only from

internal Google servers, not from the "external data source[s] designated by the user at the

content management web site" as is required by step (b) of Claim 1.  Here, too, summary

judgment is warranted against Wireless Ink.

Wireless Ink contends that Google has three separate features that infringe Claim

1 of the '342 patent: Google Plus, Google Docs, and YouTube.  Wireless Ink alleges that Google

provides a "content management web site" for each of these accused features, identified by the

URL's of, respectively, "www.plus.google.com," "www.docs.google.com," and

"www.youtube.com."  (Google 56.1 ¶¶ 17, 37, 52; Pl. 56.1 Resp. ¶¶ 17, 37, 52.)  Google also

allegedly generates a "mobile web site" for each of these features, identified by the URL's of

"www.plus.google.com/app/ . . . ," "docs.google.com/m . . . ," and "m.youtube.com."  (Google

56.1 ¶¶ 24, 41, 56; Pl. 56.1 Resp. ¶¶ 24, 41, 56.)  Wireless Ink contends that when a user decides

at the Google Plus content management web site to upload a photo or video from the user's

computer, or transfer data from a third-party web site or blog by entering a URL for the third-

party web site or blog – features which Google concedes are provided by Google Plus – then the

user has "designate[d] at least one data source that is external to the content management web

site" as is required by step (a) of Claim 1.  (Google 56.1 ¶¶ 18, 19, 21, 22; Pl. 56.1 Resp. ¶¶ 18,

19, 21, 22; Warner Decl. Re: Google, Ex. D at 23-25.)  Wireless Ink similarly contends that

when a user decides at the Google Docs content management web site to upload content from the user's computer – a feature which Google concedes is provided by Google Docs – then the user has "designate[d] at least one data source that is external to the content management web site" as is required by step (a) of Claim 1. (Google 56.1 ¶¶ 38, 39; Pl. 56.1 Resp. ¶¶ 38, 39.) Likewise, Wireless Ink contends that when a user decides at the YouTube content management web site to upload content from the user's computer – a feature which Google concedes is provided by YouTube – then the user has "designate[d] at least one data source that is external to the content management web site" as is required by step (a) of Claim 1. (Google 56.1 ¶¶ 53, 54; Pl. 56.1 Resp. ¶¶ 53, 54.) Consequently, in order to show that any of these accused features meet step (b) of Claim 1, Wireless ink must demonstrate that at least one of the alleged mobile web sites is configured to receive data automatically from one of these external data sources once the user designates the external data source at the content management web site. Wireless Ink is unable to make such a demonstration, for substantially the same reasons outlined above in the discussion of Facebook's motion for summary judgment of non-infringement of the '342 patent.

It is undisputed that when a user decides at the content management web site of one of the accused features to upload content from the user's computer, or transfer data from a third-party web site or blog in the case of Google Plus, that uploaded or transferred content is saved and stored at Google servers. (Google 56.1 ¶¶ 20, 23, 40, 55; Pl. 56.1 Resp. ¶¶ 20, 23, 40, 55.) In its Local Rule 56.1(a) statement, Google asserts that the accused mobile web sites for Google Docs, Google Plus, and YouTube receive uploaded and transferred content exclusively from these Google servers, and that the mobile web sites never receive content from any other source, including the external data sources that were designated by the user at the content management web site. (Google 56.1 ¶¶ 29, 33, 46, 48, 61, 63.) These factual assertions are

supported by citations to: (1) the deposition of Wireless Ink's technical expert, Janine Warner;
(2) the deposition of Google's technical expert, Dr. Peter Alexander; (3) the depositions of four
of Google's Federal Rule of Civil Procedure 30(b)(6) witnesses, Punit Soni, Bikin Chiu, Andrew
Bunner, and John Harding; and (4) the expert report of Dr. Alexander. (Id.) Google also cites
evidence regarding "Fiddler traces," a test used to determine the source of data delivered to a
web site. (Google 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30.) Dr. Alexander performed Fiddler traces for
each accused mobile web site, which confirmed that when the mobile web sites receive data
originating from an external data source designated by a user at the content management web
site, the mobile web sites receive such data from internal Google servers, not the original
external data source.   (Google 56.1 ¶¶ 32, 33, 47, 48, 62, 63.)   Citing Dr. Alexander's expert
report, Google additionally asserts that if the original external data source of uploaded or
transferred data is destroyed after the data has been uploaded or transferred to one of the Google
content management web sites, users of the accused mobile web sites would still be able to
access the uploaded or transferred data because such data is delivered to the generated mobile
web pages from internal Google servers.  (Google 56.1 ¶¶ 35, 50, 65.)

   Wireless Ink attempts to controvert these asserted statements of fact by repeating
– twenty-two times in total – the same flawed legal argument it advanced in response to
Facebook's motion for summary judgment: under the Court's construction of "web site" – "a set
of related web pages, including the . . . data appearing thereon which exists on the server or
servers of the website operator" – data becomes part of the mobile web site at the moment when
data is uploaded to, and thus "exists on," the servers that serve the mobile web site. (Pl. 56.1
Resp. ¶¶ 26-29, 32-34, 43-49, 57-64.)  Wireless Ink notes that the accused content management
web sites and mobile web sites are served by the same Google servers.  Therefore, according to

Wireless Ink, when a user designates an external data source at one of the content management web sites, data is uploaded to the Google servers that serve both the content management web site and the mobile web site, at which point that data instantly becomes part of the mobile web site, thus satisfying step (b)'s requirement that the mobile web site be "configured to receive data automatically from the external data source designated by the user at the content management web site." (Id.; id. ¶ 105; Pl. Opp. to Google's Mot. at 6-8.)

As discussed above regarding Wireless Ink's claims against Facebook, Wireless Ink's argument stemming from the Court's construction of "web site" exclusively concerns claim interpretation. See supra Section V. Here, Wireless Ink attempts to paint this purely legal argument as a factual dispute, but the argument is devoid of evidence regarding the operation of the accused Google features. Wireless Ink relies upon approximately four pages of deposition testimony of Bikin Chiu, one of Google's Rule 30(b)(6) witnesses, who testified only about Google Plus. (See Pl. 56.1 Resp. ¶¶ 29, 33, 46, 48, 61, 63 (citing Pitcock Decl., Ex. 2 at 47:24-48, 54:12-56:10); Second Chase Decl., Ex. 1 at 6:18-22.) The cited testimony does not support Wireless Ink's argument that data becomes part of the mobile web site at the moment it is uploaded to Google's internal servers. Rather, the testimony merely states that when a user uploads a photo at the alleged Google Plus content management web site, that photo gets uploaded to Google servers and becomes available for viewing on the alleged Google Plus mobile web site, (Pitcock Decl., Ex. 2 at 47:24-48, 54:12-56:10)), a point which is not in dispute, (see Google 56.1 ¶¶ 19, 20, 29). For Google Docs and YouTube, Wireless Ink provides no evidence to support its claim of literal infringement.

In sum, Wireless Ink fails to offer any evidence that the accused mobile web sites receive data from the same external data sources designated by the user at the accused content

management web sites, as is required by step (b) of Claim 1. Instead, Wireless Ink advances a claim interpretation argument, which the Court rejects for the same reasons outlined in Section V, supra. Because Google has come forward with evidence that it does not infringe, and in response to its motion, Wireless Ink has not come forward with evidence of infringement that would permit a reasonable fact-finder to find in its favor, Google's summary judgment motion with respect to literal infringement of the '342 patent is granted.

VII.   Neither Facebook nor Google Infringes Under the Doctrine of Equivalents.

Wireless Ink has offered no evidence to support a theory of infringement under the doctrine of equivalents, much less the "particularized testimony and linking argument on a limitation-by-limitation basis" required under well-established precedent. See, e.g., AquaTex, 479 F.3d at 1328; PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005). This is conceded by Wireless Ink with respect to both Facebook and Google, and with respect to both patents-in-suit. (Facebook 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32; Google 56.1 ¶¶ 4-6; Pl. 56.1 Resp ¶¶ 4-6.) Therefore, summary judgment of non-infringement under the doctrine of equivalents is granted against Wireless Ink with respect to both defendants and both patents-in-suit. See AquaTex, 479 F.3d at 1328 ("The same rule [that a patentee must provide particularized testimony and linking argument on a limitation-by-limitation basis] applies in the summary judgment context.").

VIII.   Defendants' Motion for Summary Judgment of Invalidity of the '342 Patent is Denied as Moot.

Defendants Facebook and Google jointly move for summary judgment of invalidity of all asserted claims of the '342 patent. Defendants contend that the asserted claims are anticipated by, or obvious in view of, U.S. Patent No. 6,834,306, issued to Mark Tsimelzon, which was filed more than two and a half years before Wireless Ink's earliest patent application.

Neither Facebook nor Google asserts a counterclaim for declaratory judgment of invalidity of the '342 patent; rather, both parties raise invalidity exclusively as an affirmative defense to Wireless Ink's infringement claims.  (Docket # 17 (Google's Answer); Docket # 46 (Facebook's First Amended Answer and Counterclaims); Docket # 19 (YouTube's Answer), 11 Civ. 1751(PKC).)

      "There has been much debate over whether a trial court . . . should consider patent validity if non-infringement is found." Brunswick Corp. v. U.S., 34 Fed.Cl. 532, 556 (Fed. Cl. 1995).  The Supreme Court has "emphasized the importance to the public at large of resolving questions of patent validity," noting that between infringement and validity, "validity has the greater public importance." Cardinal Chemical Co. v. Morton Intern., Inc., 508 U.S. 83, 100 (1993) (citations omitted).  Nevertheless, it is within a district court's discretion to dismiss as moot arguments related to invalidity once the court has found no infringement. See Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1481 (Fed. Cir.1998) (expressly declining to require trial courts to decide issues of validity once a dispute has been finally disposed of on other grounds).  In fact, where, as here, the issue of invalidity is raised solely as an affirmative defense, rather than as a counterclaim for declaratory judgment, a district court's resolution of the invalidity issue after a finding of non-infringement constitutes unnecessary dicta, if not, in certain circumstances, reversible error.[4]

---

[4] See Cardinal Chemical, 508 U.S. at 93-94 ("Our command [in Electrical Fittings] that the validity decision be eliminated was similar to the Federal Circuit's mandate in the Fonar case (both cases suggest that an appellate court should vacate unnecessary decisions regarding patent validity), but the two cases are critically different.  The issue of invalidity in Electrical Fittings was raised only as an affirmative defense to the charge that a presumptively valid patent had been infringed, not (as in Fonar, and as here) as a basis for a counterclaim seeking a declaratory judgment of patent invalidity.  An unnecessary ruling on an affirmative defense is not the same as the necessary resolution of a counterclaim for a declaratory judgment."); Hill-Rom Co., Inc. v. Kinetic Concepts, Inc., 209 F.3d 1337, 1343-44 (Fed. Cir. 2000) (holding that "there is no need for us to vacate the district court's validity ruling" where "[t]he invalidity argument was raised only as an affirmative defense by [the defendant], not in the form of a counterclaim," because the district court's validity ruling "will have no binding effect on these or any other parties"); Boss Control, Inc. v. Bombardier Inc., 410 F.3d 1372, 1376 n.1 (Fed. Cir. 2005) ("[Defendant] only filed affirmative defenses and

Having concluded that Facebook and Google are entitled to summary judgment of non-infringement with respect to both patents-in-suit, and because invalidity was raised solely as an affirmative defense, the Court, exercising its discretion, declines to consider the defendants' motion for summary judgment of invalidity of the '342 patent. The motion is denied as moot.

## CONCLUSION

For the reasons set forth above, Google's motion for summary judgment of non-infringement (Docket # 113, 10 Civ. 1841(PKC); Docket # 113, 11 Civ. 1751(PKC)) is GRANTED. Facebook's motion for summary judgment of non-infringement (Docket # 118, 10 Civ. 1841(PKC); Docket # 123, 11 Civ. 1751(PKC)) is GRANTED. Google's and Facebook's joint motion for summary judgment of invalidity (Docket # 118, 11 Civ. 1751(PKC)) is DENIED as moot. All other claims having been resolved, the Clerk is directed to enter judgment in favor of defendants Google and Facebook in the above-captioned actions, and close both cases.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 29, 2013

---

not counterclaims. Since there are no pending counterclaims with respect to invalidity, the district court entered a proper final judgment.").